**In re Jeffrey A. GARBINSKI and Lynn A. Garbinski, Debtors**

**S & T Bank, Movant**

v.

**Jeffrey A. Garbinski and Lynn A. Garbinski, Respondents.**

**No. 11–21160–TPA.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 26, 2011.

Marvin Leibowitz, Esq., Pittsburgh, PA, for the Debtor.

John N. McElroy, Esq., for S & T Bank.

### *MEMORANDUM OPINION AND ORDER*

THOMAS P. AGRESTI, Chief Judge.

The Debtors initiated this Chapter 11 proceeding on March 2, 2011. On April 5, 2011, Movant S & T Bank ("Bank") filed a *Motion for Relief from Stay* ("Stay Motion") at Document No. 22. At the May 10, 2011 preliminary hearing on the *Stay Motion,* the Debtor Husband made allegations to the effect that certain representations had been made to him by an authorized employee of S & T Bank, whose name he could not recall, that were contrary to the Bank's pursuit of the *Stay Motion.* The Court scheduled a further hearing on

the *Stay Motion* for June 9, 2011 and concluded at that time that a more formal evidentiary hearing would be needed. That evidentiary hearing was originally scheduled for June 21, 2011 and the Parties were directed to file witness and exhibit lists by June 17th. Upon request of the Debtors and the consent of the Bank the evidentiary hearing was subsequently continued to July 18, 2011. That hearing was held and the Court now grants the *Stay Motion,* for the reasons stated below.[1]

## BACKGROUND

The *Stay Motion* relates to a loan in the original amount of $1,275,000 which the Bank made to the Debtors on May 15, 2008. As part of the loan transaction the Debtors gave the Bank a mortgage on two properties located in the borough of Ben Avon, in the Pittsburgh metropolitan area. One of the properties, 235 Park Avenue, is a single-family dwelling. The other property, variously identified as 6096 Park Avenue, or 206–242 Park Avenue, or 220–212 Park Avenue, consists of a development of 19 units that were formerly rented as apartments, and which the Debtors hoped to rehabilitate and sell off individually.[2] The *Stay Motion* alleges that as of March 2, 2011, the Debtors were in default under the loan and owed $1,225,915.86, with interest accruing daily thereafter, plus additional escrow deficiencies, late charges and attorney fees.[3] The Bank alleges that the Debtors have no "material equity" in the Property and asks for relief from stay.

In their "Answer" to the *Stay Motion* the Debtors made only general denials as to the material allegations made by the Bank. In particular, nothing was stated in the *Answer* as to any representations purportedly made by Bank employees to the effect that the Bank would allow the loan to continue so the project could be completed notwithstanding the Debtors' default. Those allegations were first made orally at the May 10th preliminary hearing. Out of an abundance of caution the Court has allowed these oral allegations to be part of the case so as to ensure that the Debtors receive a "full" hearing in this matter.

At the evidentiary hearing there was no real dispute as to the amount of the debt or that the Debtors are in default. Nor was there any dispute that the Debtors have not been making any adequate protection payments to the Bank. The controversy between the Parties centered on two issues. First, what is the value of the Property? This is obviously significant because it determines whether the Debtors have any equity in the Property, a key factor in the determination whether to grant relief from stay. Second, is there any merit to the contention by the Debtors that the Bank promised it would allow the loan to continue, and in fact make further advancements to the Debtors, so that the project could be completed? For purposes of reference, during the hearing the Court termed this as an "equitable defense" by the Debtors. A final issue, which the

---

1. The Court's jurisdiction under 28 U.S.C. §§ 157 and 1334 was not at issue. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

2. The discrepancy of these different addresses being used for the same real property was noted but not explained at the evidentiary hearing. For convenience, the Court will refer to the 235 Park Avenue property individu-

ally as the "235 Property", the other individually as the "19–unit Property", and to them both collectively as "the Property".

3. At the hearing the Parties agreed that *per diem* interest had been accruing since March 2, 2011 at the rate of $138.27, adding over $19,000 to the debt to date. Additional fees at this juncture would also be appropriate, but no amount in that regard was offered.

Court deems to be of importance, but which was barely touched upon at the hearing, is whether retention of the Property is necessary for an effective reorganization of the Debtors. The Court will discuss each of these issues in turn.

### Value of the Property

■ The Bank presented appraisal reports from Muri–Muri & Associates, Inc. and the testimony of James Muri to establish the value of the Property. The Court found Mr. Muri to be a credible witness. He testified that an October 14, 2010 appraisal by Nancy Conklin, an appraiser in his office, on which he was the supervisory appraiser and "signed off," set the value of the 235 Property at $55,000 based on a sales comparison approach. Mr. Muri testified that he could not give an exact value for the 235 Property as of today, but he believed, if anything, the general Pittsburgh real estate market has weakened since the appraisal was done. As such, he believed the conclusion of a $55,000 value for the 235 Property was reasonable as a current value. The Debtors offered no contrary evidence of value but simply cross-examined Mr. Muri as to his conclusion but the Court finds that they did not undermine it in any material respect.

The valuation of the 19–unit Property was a more complicated matter for a couple of reasons. First, is its sheer size—19 separate units versus one single-family dwelling. Second, the 19–unit Property is not currently in habitable condition because the interiors of the units are in a gutted condition and need to be finished before the units could be sold to individual owners. The exterior is also in need of some finish work.

Mr. Muri testified that he personally conducted the appraisal of the 19–unit Property on August 20, 2010 and arrived at an "as is" value of $1,093,500. He reached this figure by first establishing the likely sale value of the units in a completed condition based on a sales comparison approach, and concluded that an appropriate sale price would be $85,000 for the two-bedroom units (15) and $90,000 for the three-bedroom units (4). From this starting point, he then deducted the cost of completion for each of the units, which he estimated at a per unit average of $28,561. This cost to complete includes flooring, plumbing, heating, electrical, kitchen, bathroom, deck, plaster finishing, trim, driveway, landscaping, and painting. *See Movant's Exhibit F* at F–20. Mr. Muri testified that he again visited the site on June 16, 2011, and did not observe anything that would materially change his valuation of the 19–unit Property.

The Debtors contested the valuation of the Property at the hearing but offered little substantial evidence to support their position. They first attempted to introduce into evidence an appraisal done by Robert Owen. For a number of reasons the Court disallowed this appraisal, except for use on cross-examination of Mr. Muri. First, the Debtors did not provide either the Court or the Bank with a copy of the appraisal until the time of the evidentiary hearing. Under the Court's Pretrial Scheduling Order, the Parties were to have submitted witness lists and exhibits by June 17, 2011. Not only would it have been a violation of that Order to permit the appraisal to be admitted as substantive evidence, it would also have been fundamentally unfair to the Bank, which had no opportunity to review the appraisal prior to the hearing. Counsel for the Debtors stated that he himself had only received the appraisal the morning of the hearing but the Court noted that the report was dated June 28, 2011, nearly three weeks prior to the hearing, leaving plenty of time for the Debtors to have supplied a copy to the Court and the Bank and to have filed a

motion seeking to have the report allowed. Second, Mr. Owen was not even present to testify at the hearing, and without such testimony the appraisal report could not have come in to evidence in any event. Third, the appraisal appears to have been done as to only a single, two-bedroom unit on the 19–unit Property. Nothing was provided to indicate if this appraisal was intended to be applied in a strict, extrapolative fashion to arrive at a total value for the 19–unit Property. Without more, the Court was not willing to make that assumption on its own.

The only admissible evidence as to value which the Debtors presented was the lay opinion testimony of Husband Debtor, Jeff Garbinski, given in his capacity as an owner of the Property. With respect to the 235 Property, Mr. Garbinski testified that he paid $55,000 for it approximately five years ago. When asked what he believes it is presently worth, he first testified that "it's worth more than Mr. Muri said it was worth. I don't know the exact number but it is surely worth more than that." Upon being pressed further by his attorney, Mr. Garbinski testified that he thought the 235 Property would sell for between $86,000 and $90,000. He did not offer any comparable sales or other data or basis to support his opinion.

With respect to the 19–unit Property, Mr. Garbinski testified that after he rented the units for about five years following its purchase, he decided to rehabilitate the buildings and sell them off as individual units. In his opinion, the two-bedroom units are worth about $70,000 "as is," and will be worth around $80,000 upon completion. The corresponding figures he gave for the three-bedroom units are $85,000 and $95,000.

The Court finds that the evidence presented by the Bank is more credible as to the value of the Property than that provided by the Debtors. Mr. Muri's reasoning was carefully laid out in the appraisal reports and was based on objective data that was articulated in some detail. By contrast, Mr. Garbinski's opinion appeared to be based on his "gut level" feeling as to the Property value, and very arbitrary, with no attempt made to relate it to any supporting facts.

Additionally, the Court did not find Mr. Garbinski's testimony to be internally consistent. Given the numbers he opined for the current "as is" value of the individual components of the Property (i.e., $90,000 for the 235 Property, $70,000 for each two-bedroom unit, and $85,000 for each three-bedroom unit), the result by applying simple arithmetic should be a total current, as-is value of $1,480,000. However, when asked by his attorney what he thought was the total current value of the Property, Mr. Garbinski stated $1,660,000, with no explanation for the large discrepancy. When asked by his attorney what he thought the total "as completed" value would be, Mr. Garbinski stated "an additional 1.8 to 1.9." (Although Mr. Garbinski did not specify he was referring to "million" here, that was evident from the context.) If Mr. Garbinski really meant that this would be in addition to the current "as is" value he had just stated, for a total of approximately $3.5 million, that is totally out of the realm of support. If the Court gives him the benefit of the doubt and assumes that he misspoke and really meant to say the total value of the Property after completion would be $1.8 to 1.9 million, that would still be inconsistent with his other testimony as to the "as completed" value of the individual components.[4] Either way, Mr. Garbinski's credibility was further undermined.

4. Applying simple arithmetic to his "as completed" opinion ($90,000 for 235 Park,

Finally, as noted by the Bank, only a few days prior to the hearing the Debtors submitted an amended Schedule "A" that shows the value of the Property as $1.3 million. Mr. Garbinski tried to explain this away as merely an error, but the Court finds it to be in keeping with the Debtors' overall poor presentation as to the value issue. As such, the testimony of Mr. Garbinski was not credible to the Court on the issue of value.

To sum up, the Court finds that the Bank's position as to the value of the Property is accurate and consequently finds that the Debtors lack equity in the Property because that value is substantially less than the amount admittedly owed on the loan.[5]

### Equitable Defense

■ As indicated above, "equitable defense" is the term adopted by the Court to describe the contention raised by the Debtors to the effect that the Bank had made representations that the loan would be permitted to continue through project completion, such that it would be inequitable to allow the Bank to obtain relief from stay. The Court ruled that this was in the nature of an affirmative defense, and that the Debtors would therefore have the burden of proof on this issue, assuming the Bank proved its case as to value. The Debtors have clearly failed to meet this burden of proof.

To begin with, because it was not pleaded by the Bank in the *Stay Motion*, the Court was surprised to learn near the close of the evidentiary hearing that the Bank had actually obtained a state court judgment against the Debtors as to the loan in a foreclosure action prior to the

filing of the bankruptcy petition. *See Movant's Exhibits "C"–"E,"* showing a default judgment in the amount of $1,197,850.64 entered in the Allegheny County Court of Common Pleas on December 30, 2010 in *S & T Bank v. Garbinski,* GD–10–20748. That judgment was never appealed and is therefore final. Had the Court been made aware of the state court judgment earlier, it likely would not have even heard any evidence as to the equitable defense because it appears that such defense is barred by application of the *Rooker–Feldman* doctrine. *See, e.g., In re Porovne,* 436 B.R. 791 (Bankr. W.D.Pa.2010) (*Rooker–Feldman* doctrine precludes a bankruptcy court from litigating a claim that was actually litigated in state court or is inextricably intertwined with the state adjudication, meaning that federal relief can only be predicated upon a conviction that the state court was wrong). The equitable defense appears to fall under the inextricably-intertwined prong of the *Rooker–Feldman* doctrine since the Court is being asked, in effect, to find that the Bank should not have been able to obtain its state court judgment against the Debtors. If the Debtors wanted to raise the equitable defense, they should have done so in the state court foreclosure action. Based upon the evidence presented at the hearing, this Court likely lacks the subject matter jurisdiction to consider such defense at this time.

However, since it heard all the evidence presented by the Debtors, the Court is in a position to conclude, assuming *Rooker–Feldman* was somehow not implicated, that the Debtors failed to establish the equitable defense. Mr. Garbinski testified that he had spoken with "someone" at the

---

$80,000 for two-bedroom units, and $95,000 for three-bedroom units) yields a total expected "as completed" value of only $1,670,000.

**5.** The *Stay Motion* alleges a total amount due of $1,225,915.86 as of March 2, 2011, but

additional interest and costs have accrued since then raising the amount. See footnote 3. The value of the Property is found to be $1,148,500.

Bank about getting the loan extended. He stated that this person was not the Bank's loan officer, Monica Robinson, but he otherwise could not identify the person. The Court obviously cannot find that the Bank somehow became obligated to extend the loan based on alleged representations by a phantom person who cannot be identified.

The Debtors also presented the testimony of their general contractor, Justin Gunn. Mr. Gunn testified that he had worked on the 19–unit Property for about 7 months and for about 3 or 4 months of that time Mr. Garbinski was in the hospital. During the period of this hospitalization Mr. Gunn had direct communications "off and on" with Monica Robinson about the project, but he testified that those discussions did not deal with funding for the project. He testified that he was told by Ms. Robinson to complete the steel work he was doing (apparently a reference to support structure on the exterior of the buildings) and he would be paid for it. At that point he was to stop any further work until some needed paperwork was signed by Mr. Garbinski. Mr. Gunn testified that he was "under the assumption" that the project would be completed, and at another point testified that completion was "implied" in Ms. Robinson's directions. However, Mr. Gunn did not provide any testimony that Ms. Robinson had ever told him that the Bank would extend the loan so that the project could be completed.[6] The Court will not find that the equitable defense has been proven based on such vague and amorphous assumptions.

The Debtors also presented two e-mails which they argue provided support for their equitable defense. Respondents' Exhibit "1" is a June 22, 2010 e-mail from Ms. Robinson to Mr. Garbinski that says the loan matured on May 30, 2010 and the Bank would grant a two-month extension. Such an extension was, in fact, done, and the complaint filed in the Allegheny County foreclosure action reflects that the loan had an original due date of May 30, 2010, which was subsequently extended for two months. Nothing in Exhibit "1" supports any promise of an extension beyond July 30, 2010. Respondents' Exhibit "2" is a September 9, 2010 e-mail from Steve Landis to Mr. Garbinski. Mr. Landis works in the Special Assets Department of the Bank and handles troubled loans. The Garbinski loan was assigned to him after it went into default. The Court has reviewed Exhibit "2" and finds that it contains nothing that can reasonably be construed as a promise for any further extension of the loan, at least not unless the Debtors were to deposit approximately $100,000 with the Bank, representing the difference between their estimated cost of completion of the project and the available funds potentially remaining for distribution under the loan agreement. There was no evidence presented that the Debtors ever made such deposit, so nothing in Exhibit "2" can be viewed as a breach of any promise by the Bank. The Court therefore finds that the Debtors have not met their burden of proof with respect to the equitable defense they raised.[7]

### Necessary for Reorganization

The *Stay Motion* does not specifically state the statutory basis for the requested

6. Mr. Gunn testified that he and several of his subcontractors are still owed money by S & T Bank for work they did after Ms. Robinson told them they would be paid. To the Court's knowledge, Mr. Gunn and his subcontractors have not asserted a direct claim against the Bank for payment. Should they ever do so, this ruling on the *Stay Motion* should in no way be viewed as making any finding regarding the merits of any such claim.

7. The Court would also note that both Ms. Robinson and Mr. Landis testified at the hearing and denied making any promise to extend

relief from the automatic stay, though it became apparent at the hearing that the Bank was proceeding under either 11 U.S.C. § 362(d)(1) or (2). Relief under *Section 362(d)(1)* is granted "for cause, including the lack of adequate protection." Relief under *Section 362(d)(2)* is granted if the debtor does not have any equity in the property *and* the property is not necessary for an effective reorganization. As indicated above, although the Court considers this last point to be of key importance, particularly because of its finding that the Debtors lack equity in the Property, scant attention was paid to it by the Debtor Respondents at the evidentiary hearing.

■ The Debtors had the burden of proving that the Property is necessary for an effective reorganization. See 11 U.S.C. § 362(g); *In re Diversified Energy Venture*, 311 B.R. 712, 717 (Bankr.W.D.Pa. 2004). In order to meet this burden, the Debtors were required to show that there is "a reasonable probability of a successful reorganization within a reasonable time." *Id.* at 719 (quoting *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). The Debtors failed woefully in sustaining their burden in this regard at the hearing. They provided absolutely no evidence to demonstrate a reasonable probability of a successful reorganization within a reasonable time, or that the Property would be necessary for such reorganization.

### CONCLUSION

■ Relief from the automatic stay is appropriate under 11 U.S.C. § 362(d)(2)

the loan beyond July 30, 2010. The Court found both witnesses to be credible on that point.

8. A further relevant factor in finding that cause exists for relief from stay is the uncom-

because the Debtors lack equity in the Property and the Property is not necessary to an effective reorganization. In the alternative, relief from the automatic stay is also appropriate under 11 U.S.C. § 362(d)(1) for cause, such cause being the failure of the Debtors to make any payments to the Bank for an extended period of time, or even propose to make payments directly or via a feasible plan.[8] The Debtors have not raised any affirmative or equitable defense which would defeat the Bank's right to obtain relief from stay.

***AND NOW,*** this ***26th*** day of ***July, 2011,*** for the reasons stated above, it is ***ORDERED, ADJUDGED and DECREED*** that the ***Motion for Relief from Stay,*** filed at Document No. 22, is ***GRANTED*** and S & T Bank is granted relief from the automatic stay as to its interest in the Property which is the subject of the *Stay Motion.*

pleted and vacant status of the 19–unit Property which increases the risk of deterioration. *See In Re Behanna,* 381 B.R. 631, 643–44 (Bankr.W.D.Pa.2008).